1    Robert C. Moest, Of Counsel, SBN 62166
2    **THE BROWN LAW FIRM, P.C.**
3    2530 Wilshire Boulevard, Second Floor
     Santa Monica, CA 90403
4    Telephone: (310) 915-6628
     Facsimile: (310) 915-9897
5    Email: RMoest@aol.com

6    *Counsel for Plaintiff*
7

8              **UNITED STATES DISTRICT COURT**
9              **CENTRAL DISTRICT OF CALIFORNIA**
10

11   DANIEL JONG, derivatively on behalf
     of THE TRADE DESK, INC.,
12
                                              Case No.:
13              Plaintiff,

14        v.

15                                            **DEMAND FOR JURY TRIAL**
     JEFF T. GREEN, LAURA
16   SCHENKEIN, LISE J. BUYER,
     ANDREA L. CUNNINGHAM,
17   KATHRYN E. FALBERG,
     SAMANTHA JACOBSON, GOKUL
18   RAJARAM, and DAVID B. WELLS,
19                                            **VERIFIED SHAREHOLDER**
                Defendants,                   **DERIVATIVE COMPLAINT**
20
21        and
22
23   THE TRADE DESK, INC.,
24              Nominal Defendant.
25
26
                       **INTRODUCTION**
27
28       Plaintiff Daniel Jong ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively

─────────────────────────────────────────────

and on behalf of nominal defendant The Trade Desk, Inc. ("Trade Desk" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jeff T. Green ("Green"), Laura Schenkein ("Schenkein"), Lise J. Buyer ("Buyer"), Andrea L. Cunningham ("Cunningham"), Kathryn E. Falberg ("Falberg"), Samantha Jacobson ("Jacobson"), Gokul Rajaram ("Rajaram"), and David B. Wells ("Wells") (collectively, the "Individual Defendants," and together with Trade Desk, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Trade Desk, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Trade Desk, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 9, 2024 and February 12, 2025, inclusive (the "Relevant Period").

2.    Trade Desk is an international technology company that runs a self-service, cloud-based advertising purchasing platform. The Company's platform grants its clients the ability to plan, manage, evaluate, and optimize digital advertising campaigns based on data provided. The campaigns that can be utilized through the Company's platform include

connected television ("CTV") as well as other video, display, audio, and native formats across an array of devices, including television, streaming services, mobile devices, computers, and more.

3.    On June 6, 2023, prior to the start of the Relevant Period, the Company launched "Kokai", an artificial intelligence ("AI") tool that gives users the ability to more effectively deploy their advertising spending. Upon launch, the Company touted Kokai as a "major advancement in programmatic AI" and granting access to "more than 13 million advertising impressions every second."

4.    Following the launch of the Kokai platform, the Company started transitioning its clients from the old platform, Solimar, to Kokai. Defendant Green highlighted the transition as the "largest platform overhaul in our company's history." Despite this, the Individual Defendants assured investors that the transition would be "without [] disruption" and Kokai would be fully rolled out throughout 2024.

5.    The Relevant Period began on May 8, 2024, when, after the markets closed, the Company issued a press release (the "Q1 2024 Earnings Release") announcing its financial results for the first quarter of the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"). The Q1 2024 Earnings Release revealed the Company posted a reported revenue of $491 million in the first quarter, a 28% increase year over year. The Q1 2024 Earnings Release also quoted Defendant Green as stating:

> Q1 was a strong quarter for The Trade Desk as we delivered revenue of $491 million, accelerating growth to 28% year-over-year. Our outstanding performance to start the year underlines the value advertisers are placing on premium inventory on the open internet[.] With the continued strong growth of CTV, the growing ubiquity of UID2, new approaches to authentication, greater deployment of first-party data and retail data, and with significant AI advances in our Kokai platform, we are better positioned than ever to deliver premium value to advertisers and continue to gain market share.

6.    Throughout the Relevant Period, the Individual Defendants consistently

issued or caused the Company to issue these positive statements pertaining to Kokai, namely highlighting the value posed to the Company and its clients, as well as the positive impact Kokai would have on the Company's financial prospects.

7.      The truth emerged on February 12, 2025 when the Company issued a press release announcing its financial results for the fourth quarter and full year of the 2024 Fiscal Year (the "FY 2024 Earnings Release"). The FY 2024 Earnings Release revealed that the Company posted fourth quarter revenue of only $741 million, $15 million less than the previously reported guidance of $756 million, and $18.8 million less than analysts' estimates of $759.8 million.

8.      Later that same day, the Company hosted an earnings call with investors and analysts to discuss the results (the "FY 2024 Earnings Call"). During the FY 2024 Earnings Call, Defendant Green announced that the Company still had not yet reached a full adoption of Kokai, revealing that the Company was "maintaining 2 systems, Solimar and Kokai. This slows us down," that "Kokai rolled out slower than we anticipated," and even that "in some cases, the slower Kokai rollout was deliberate."

9.      On this news, the Company's stock price fell $40.31 per share, or approximately 33%, from a closing price of $122.23 per share on February 12, 2025 to close at $81.92 per share on February 13, 2025.

10.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was experiencing unanticipated challenges in rolling out Kokai, specifically in transitioning clients from Solimar to Kokai and performance issues that impacted customer adoption; (2) as a result of these challenges, there was a delay in Kokai's full rollout; (3) in certain instances, this delay was deliberate

to maximize the Company's short-term profits; (4) the Company was also experiencing competition from Amazon and other platforms that detracted from the Company's market share; (5) the Company's engineering and sales teams were not structured appropriately to support the Kokai rollout while fending off competition; and (6) the Company's failure to fully rollout Kokai according to the expected timeframe would have a negative impact on the Company's business, operations, and financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Trade Desk to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between August 2024 and December 2024, approximately 978,000 shares of Trade Desk common stock were repurchased at artificially inflated prices, costing the Company approximately $110.5 million. As the Company's stock was actually worth only $81.92 per share, the price at which it was trading when markets closed on February 13, 2025, the Company overpaid for repurchases of its own stock by approximately $30.4 million in total.

13.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while five of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $117.7 million***.

14.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.    In light of the Individual Defendants' misconduct—which has subjected the Company; its co-founder, President, Chief Executive Officer ("CEO"), and Chairman of

the Company's Board of Directors (the "Board"); and its Chief Financial Officer ("CFO") to three federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities Class Actions"), has subjected the Company's Chief Strategy Officer and a director to one of the Securities Class Actions, and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Green's, Defendant Schenkein's, and Defendant Jacobson's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

Verified Shareholder Derivative Complaint

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Trade Desk is headquartered in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Trade Desk. Plaintiff has continuously held Trade Desk common stock at all relevant times.

### Nominal Defendant Trade Desk

23.     Trade Desk is a Nevada corporation with principal executive offices at 42 N. Chestnut Street, Ventura, California, 93001. Trade Desk's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "TTD."

### Defendant Green

24.     Defendant Green co-founded the Company and has served as the Company's President, CEO, and the Chairman of the Board since November 2009. According to the Schedule 14A the Company filed with the SEC on April 12, 2024 (the "April 2024 Proxy Statement"), as of February 29, 2024, Defendant Green beneficially owned 5,103,179 shares of the Company's Class A common stock, representing 1.1% of all Class A shares, as well as 42,882,150 shares of the Company's Class B common stock, representing 97.6% of all Class B shares, and granting Defendant Green 48.9% voting power. As such, Defendant Green is a controlling shareholder of the Company.

25.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Green made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|-----------------|----------------------|--------------|
| August 22, 2024 | 135,922 | $103.72 | $14,097,830 |
| August 26, 2024 | 283,429 | $104.20 | $29,533,302 |
| September 20, 2024 | 200,000 | $109.47 | $21,894,000 |
| September 23, 2024 | 200,000 | $180.68 | $21,736,000 |
| September 25, 2024 | 200,000 | $110.54 | $22,108,000 |
| October 4, 2024 | 200,000 | $112.96 | $22,592,000 |
| October 7, 2024 | 200,000 | $112.30 | $22,460,000 |
| October 9, 2024 | 80,649 | $115.50 | $9,314,959 |
| January 7, 2025 | 18,207 | $125.44 | $2,283,886 |

Thus, in total, before the fraud was exposed, Defendant Green sold 1,518,207 shares of Company stock on inside information, for which he received approximately $166,019,977 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26.     The April 2024 Proxy Statement stated the following about Defendant Green:

**Jeff T. Green** co-founded The Trade Desk and has served as our president and chief executive officer and as a member of our board of directors since November 2009. Prior to joining The Trade Desk, from May 2004 to October 2009, Mr. Green founded AdECN, the world's first online advertising exchange, and served as its chief operating officer, where he led strategy, product and business development until it was acquired by Microsoft in 2007. At Microsoft Corporation, Mr. Green oversaw the AdECN exchange business, as well as all reseller and channel partner business. Mr. Green has also played

a leadership role in the ad tech industry, having served on the Networks and Exchanges Quality Assurance Guidelines Committee for the Internet Advertising Bureau ("IAB") from 2011 to 2012. At IAB, Mr. Green led working groups that established rules and best practices for acquiring inventory and set data transaction standards.

We believe that Mr. Green is qualified to serve on our board of directors due to his extensive management experience and sophisticated industry background.

**Defendant Schenkein**

27.    Defendant Wood has served as the Company's CFO since June 2023.

28.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schenkein made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| June 14, 2024 | 43,705 | $95.38 | $4,168,583 |
| July 9, 2024 | 25,000 | $100.43 | $2,510,750 |
| August 16, 2024 | 3,130 | $99.33 | $310,903 |
| October 9, 2024 | 25,000 | $115.43 | $2,885,750 |

Thus, in total, before the fraud was exposed, Defendant Schenkein sold 96,835 shares of Company stock on inside information, for which she received approximately $9,875,986 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

29.    The April 2024 Proxy Statement stated the following about Defendant Schenkein:

**Laura Schenkein** has served as our chief financial officer since June 2023. She has held various roles at the Company since February 2014. She served as executive vice president, financial planning and analysis from February 2023 to June 2023. Prior to that role, Ms. Schenkein served as senior vice president, financial planning and analysis from January 2019 to February

2023, as vice president, financial planning and analysis from January 2017 to December 2018 and as director, financial planning and analysis from February 2014 to January 2017. Ms. Schenkein previously worked in finance and strategy in the healthcare technology and investment banking industries. Ms. Schenkein received a B.A. in International Relations from Tufts University and an M.B.A. from The Wharton School.

**Defendant Buyer**

30.    Defendant Buyer has served as a Company director since March 2019 and as Lead Independent Director of the Company since February 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

31.    The April 2024 Proxy Statement stated the following about Defendant Buyer:

**Lise J. Buyer** has served as a member of our board of directors since March 2019, and she was appointed as lead independent director in February 2021. Since 2006, Ms. Buyer has served as a partner of Class V Group LLC, a consulting firm she co-founded that advises companies on initial public offerings and other market strategies. From August 2005 to August 2006, she served as vice president of Tellme Networks, Inc., a private Internet telephone business. Between April 2003 and August 2005, Ms. Buyer served as the director of business optimization at Google. From September 2002 to March 2003, she served as a consultant and the director of research for Vista Research LLC, an independent equity research firm in New York, New York. From May 2000 to July 2002, she was a general partner at Technology Partners, a Palo Alto, California venture capital firm. Ms. Buyer was the director of internet/new media research at Credit Suisse First Boston from July 1998 to May 2000. Prior to that, she spent six years as vice president at T. Rowe Price Group, Inc. working predominantly on its Science and Technology Fund, and the preceding nine years as an institutional equity investor and analyst of both the technology and media industries. Ms. Buyer served on the board of directors of publicly traded Greenfield Online Inc., an online survey company, from April 2004 until it was acquired by Microsoft Corporation. Ms. Buyer received a B.A. in Economics and Geology from Wellesley College and an M.B.A. from the Owen Graduate School of Management at Vanderbilt University.

We believe that Ms. Buyer is qualified to serve on our board of directors due
to her extensive management experience, high-growth company background
and strategic leadership track record.

**Defendant Cunningham**

32.     Defendant Cunningham has served as a Company director since January 2022.
She is also a member of the Nominating and Corporate Governance Committee.

33.     During the Relevant Period, while the Company's stock price was artificially
inflated and before the scheme was exposed, Defendant Cunningham made the following
sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| August 15, 2024 | 1,606 | $100.07 | $160,712 |

Thus, in total, before the fraud was exposed, Defendant Cunnigham sold 1,606 shares of
Company stock on inside information, for which she received approximately $160,712 in
total proceeds. Her insider sale, made with knowledge of material nonpublic information
before the material misstatements and omissions were exposed, demonstrates her motive
in facilitating and participating in the scheme.

34.     The April 2024 Proxy Statement stated the following about Defendant
Cunningham:

**Andrea L. Cunningham** has served as a member of our board of directors
since January 2022. Since 2012, Ms. Cunningham has served as the president
of Cunningham Collective, a consulting firm she founded that advises
companies on marketing, brand and communication strategies. She previously
held various senior marketing positions at various companies, including
serving as Chief Marketing Officer for Avaya Inc., a cloud communications
company, from 2014 to 2015. Ms. Cunningham currently serves on the boards
of directors of numerous private companies, and previously served on the
boards of directors of RhythmOne plc (formerly Blinkx), a digital advertising
technology company then-traded on the London Stock Exchange, from
February 2016 to February 2018. Ms. Cunningham received a B.A. in English
from Northwestern University and completed the Harvard Business School
Executive Education program.

* * *

We believe that Ms. Cunningham is qualified to serve on our board of directors due to her extensive management experience, track record at other technology companies and industry background.

**Defendant Falberg**

35.    Defendant Falberg has served as a Company director since August 2016. She also serves as the Chair of the Compensation Committee.

36.    The April 2024 Proxy Statement stated the following about Defendant Falberg:

**Kathryn E. Falberg** has served as a member of our board of directors since August 2016. Ms. Falberg served as executive vice president and chief financial officer of Jazz Pharmaceuticals, PLC, a biopharmaceutical company, from March 2012 to March 2014 after serving as senior vice president and chief financial officer since December 2009. From 2001 through 2009, Ms. Falberg worked with a number of smaller companies, including AdECN, Inc. ("AdECN"), while serving as a corporate director and audit committee chair for several companies. Ms. Falberg was with Amgen from 1995 through 2001, where she served as senior vice president, finance and strategy and chief financial officer and before that as vice president, controller and chief accounting officer, and vice president, treasurer. Ms. Falberg currently serves on the board of directors of publicly traded Arcus Biosciences, Inc., and Nuvation Bio, and previously served on a number of boards including publicly traded Tricida, Inc., Urogen Pharma Ltd., Aimmune Therapeutics, Inc., Axovant Sciences Ltd., BioMarin Pharmaceutical Inc, Medivation, Inc., Halozyme Therapeutics, Inc., and aTyr Pharma, Inc. Ms. Falberg received a B.A. in Economics and an M.B.A. from the University of California, Los Angeles and is a Certified Public Accountant (inactive).

We believe that Ms. Falberg is qualified to serve on our board of directors due to her extensive management experience, strategic leadership track record and service on other boards of directors.

**Defendant Jacobson**

37.    Defendant Jacobson has served as the Company's Chief Strategy Officer since February 2022 and has served as a Company director since January 2024.

38.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Jacobson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| August 16, 2024 | 4,872 | $99.50 | $484,764 |
| January 28, 2025 | 4,298 | $118.56 | $509,571 |

Thus, in total, before the fraud was exposed, Defendant Jacobson sold 9,170 shares of Company stock on inside information, for which she received approximately $994,335 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

39.    The April 2024 Proxy Statement stated the following about Defendant Jacobson:

**Samantha Jacobson** has served as a member of our board of directors since January 2024 and as our Chief Strategy Officer since February 2022. Prior to her appointment as our Chief Strategy Officer, Ms. Jacobson served as Vice President, Strategic Partnerships. Before joining The Trade Desk in 2021, Ms. Jacobson served as Vice President of Strategy and Business Development at Oracle from March 2019 to March 2021 and as Senior Director of Strategy and Business Development for Oracle Data Cloud from April 2015 to March 2019. Ms. Jacobson received a B.S.E in Finance and Management from The Wharton School at the University of Pennsylvania and an M.B.A. from the Harvard Business School.

We believe that Ms. Jacobson is qualified to serve on our board of directors due to her extensive management experience leading strategic initiatives and industry background.

**Defendant Rajaram**

40.    Defendant Rajaram has served as a Company director since May 2018. He also serves as a member of the Audit Committee and the Compensation Committee.

41.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Rajaram made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| June 21, 2024 | 2,415 | $97.92 | $236,477 |
| July 22, 2024 | 1,355 | $98.37 | $133,291 |
| September 24, 2024 | 1,355 | $109.00 | $147,695 |
| October 21, 2024 | 1,355 | $117.89 | $159,741 |

Thus, in total, before the fraud was exposed, Defendant Rajaram sold 6,480 shares of Company stock on inside information, for which he received approximately $677,204 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42.    The April 2024 Proxy Statement stated the following about Defendant Rajaram:

**Gokul Rajaram** has served as a member of our board of directors since May 2018. Mr. Rajaram invests in and advises technology companies. Mr. Rajaram served on the executive team at DoorDash Inc. ("DoorDash") from November 2019 until April 2024, after DoorDash acquired a food delivery business owned by Square, Inc. ("Square") called Caviar, Inc. ("Caviar"), where he served as the Lead for Caviar. Prior to DoorDash, Mr. Rajaram worked as the Product Engineering Lead from July 2013 to October 2019 at Square, where he led several product development teams and served on Square's executive team. Before joining Square in July 2013, Mr. Rajaram served as Product Director, Ads at Facebook, Inc. from August 2010 to July 2013, where he helped Facebook transition its advertising business to become mobile-first. Mr. Rajaram served as Product Management Director for Google AdSense from January 2003 to November 2007, where he helped launch the product and grow it into a substantial portion of Google's business. Mr. Rajaram has served on the boards of directors of Coinbase Inc. since August 2020 and

publicly traded Pinterest, Inc. since February 2020. He also served on the board of directors of publicly traded RetailMeNot, Inc. from September 2013 until it was taken private in May 2017. Mr. Rajaram received a B. Tech in Computer Science from the Indian Institute of Technology Kanpur, an M.S. in Computer Science from the University of Texas and an M.B.A. from the Massachusetts Institute of Technology Sloan School of Management.

We believe that Mr. Rajaram is qualified to serve on our board of directors due to his extensive entrepreneurial background, strategic leadership track record and service on other boards of directors of technology companies.

### **Defendant Wells**

43.    Defendant Wells has served as a Company director since December 2015. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

44.    The April 2024 Proxy Statement stated the following about Defendant Wells:

**David B. Wells** has served as a member of our board of directors since December 2015. Mr. Wells served as the chief financial officer of Netflix, Inc., a media-services provider, for eight years, retiring in early 2019 after nearly 15 years with the company and having served as vice president of financial planning and analysis prior to chief financial officer. Mr. Wells is also a director for public direct to consumer healthcare company HIMS, where he is audit chair, and is the chairman of the board and a member of the remuneration committee (formerly the senior independent director) for UK based fintech company WISE PLC. Mr. Wells received a B.S. in Commerce and English from the University of Virginia and an M.B.A./M.P.P. Magna Cum Laude from the University of Chicago.

We believe that Mr. Wells is qualified to serve on our board of directors due to his extensive management experience, financial expertise, high-growth company background and strategic leadership track record.

### **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

45.    By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Trade Desk and because of their ability to control the business and corporate affairs of Trade Desk, the Individual Defendants owed Trade Desk and its

shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Trade Desk in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Trade Desk and its shareholders so as to benefit all shareholders equally.

46.    Each controlling shareholder, director, and officer of the Company owes to Trade Desk and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

47.    The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Trade Desk, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.    To discharge their duties, the controlling shareholder, officers, and directors of Trade Desk were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49.    Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of Trade Desk, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all

relevant times.

50.    As controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

51.    To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of Trade Desk were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, California, and the United States, and pursuant to Trade Desk's corporate governance and applicable business practice standards;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Trade Desk conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to

make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Trade Desk and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Trade Desk's operations would comply with all applicable laws and Trade Desk's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.    Each of the Individual Defendants further owed to Trade Desk and its shareholders the duty of loyalty requiring that each favor Trade Desk's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

53.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Trade Desk and were at all times acting within the course and scope of such

agency.

54.     Because of their advisory, executive, managerial, directorial, and controlling positions with Trade Desk, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

55.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Trade Desk.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

58.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Trade Desk was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

60.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Trade Desk and was at all times acting within the course and scope of such agency.

## TRADE DESK'S CODE OF CONDUCT AND ETHICS

61.    Trade Desk's Code of Conduct and Ethics (the "Code of Conduct") states that it applies to "[a]ll directors, officers and employees (each, a ***Covered Party***", and collectively, the "***Covered Parties***") of the Company."

62.    In the section, "Conflicts of Interest," the Code of Conduct states, in relevant part:

A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole.

* * *

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the

Company's Chief Financial Officer or General Counsel.

63.    In the section, "Disclosures," the Code of Conduct states:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

64.    In the section, "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

The Company is obligated to comply with all applicable laws, rules and regulations.  It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

65.    In the section, "Reporting, Accountability, and Enforcement," the Code of Conduct states, in relevant part:

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to their supervisor, or directly to the Company's Chief Financial Officer or General Counsel. Nothing in this Code prevents you from communicating directly with relevant government authorities about potential violations of law. Reports may be made anonymously. If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.

66.    In the section, "Waivers," the Code of Conduct states:

Before an employee, or an immediate family member of any such employee, engages in any activity that would be otherwise prohibited by the Code, he or she is strongly encouraged to obtain a written waiver from the Board or other appropriate officer or body.

Before a director or executive officer, or an immediate family member of a director or executive officer, engages in any activity that would be otherwise prohibited by the Code, he or she must obtain a written waiver from the disinterested directors of the Board. Such waiver must then be disclosed to the Company's shareholders, along with the reasons for granting the waiver.

67.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and unjust enrichment, including five Defendants who sold Company stock on inside information. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Trade Desk's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## TRADE DESK'S AUDIT COMMITTEE CHARTER

68.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states the purpose of the Audit Committee as:

> The purpose of the Audit Committee (the "Committee") is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company.
>
> The Committee's responsibilities are limited to oversight.  The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.  Each member of the Committee is entitled to rely on the integrity of those persons within the Company and from the professionals and experts from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

69.    In the section "Duties and Responsibilities," under the subheading "Annual Financial Statements and Annual Audit," the Audit Committee Charter states the responsibilities of the Audit Committee as:

> 3.  Audit Problems. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.
>
> 4.  Form 10-K Review.  The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
>
> 5.  Audit Committee Report.  The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

70.    In the same section, under the subheading "Quarterly Financial Statements,"

the Audit Committee Charter states the responsibilities of the Audit Committee as:

> 6. Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

71.    In the same section, under the subheading "Other Duties and Responsibilities," the Audit Committee Charter states the responsibilities of the Audit Committee as:

> 7. Review of Earnings Releases.    The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

> 8. Risk Assessment and Risk Management.  The Committee must discuss the Company's policies with respect to risk assessment and risk management.

> 9. Complaint Procedures.  The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

> 10. Reports to the Board of Directors.  The Committee must report regularly to the Board regarding the activities of the Committee.

> 11. Committee Self-Evaluation.  The Committee must periodically perform an evaluation of the performance of the Committee.

> 12. Review of this Charter.  The Committee must annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

> 13. Review of Related Person Transactions.  The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved by the Committee.

> 14. Review of Code of Ethics.    The Committee must, at least annually,

Verified Shareholder Derivative Complaint

consider and discuss with management and the independent auditor the
Company's Code of Conduct and Ethics and the procedures in place to
enforce the Code of Conduct and Ethics.  The Committee must also
consider and discuss and, as appropriate, grant requested waivers from the
Code of Conduct and Ethics brought to the attention of the Committee,
though the Committee may defer any decision with respect to any waiver
to the Board.

72.    In violation of the Audit Committee Charter, the Individual Defendants
conducted little, if any, oversight of the Company's engagement in the Individual
Defendants' scheme to issue materially false and misleading statements to the public and
to facilitate and disguise the Individual Defendants' violations of law, including breaches
of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of
corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit
Committee Charter, the Individual Defendants failed to maintain the accuracy of the
Company records and reports, comply with laws and regulations, act in good faith and
diligence without misstating, misrepresenting, or omitting material facts, and properly
report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

73.    Trade Desk is an international technology company founded in 2009. Since
then, the Company has run a self-service, cloud-based advertising purchasing platform.
The Company's platform grants its clients the ability to plan, manage, evaluate, and
optimize digital advertising campaigns based on data provided. The campaigns that can be
utilized through the Company's platform include CTV as well as other video, display,
audio, and native formats across an array of devices, including television, streaming
services, mobile devices, computers, and more.

74.    The Company's platform allows clients to select target audiences, create
custom audiences through uploading first-party data, upload creative content, and choose
where to activate advertising campaigns by selecting one of the platform's inventory

options.

75.    Trade Desk's platform operates in a programmatic auction system similar to the stock market that allows clients to compete for advertising impressions in real time. The system works by placing bids on available inventory, thereby allowing clients to participate in advertising auctions in the little time it otherwise would take a digital advertisement to load. Clients are also able to set maximum and minimum bids, allowing the algorithm to work within a set price range, as opposed to a fixed amount.

76.    Trade Desk's revenue is generated through charging its clients a fixed platform fee based on the percentage of a client's total advertising spend on the platform for self-service use of the platform, where clients otherwise oversee campaign setup and execution themselves. In other instances, where the Company does the trading and sets up (i.e., managed service campaigns), an incremental fee is charged on top of the platform fee. The Company also has "fee features," which would allow for customization and optimization of advertising campaigns and are a key revenue driver which otherwise generates significant margins for the Company.

77.    On June 6, 2023, prior to the start of the Relevant Period, the Company launched "Kokai", an AI tool that gives users the ability to deploy their advertising spending more effectively. Upon launch, the Company touted Kokai as a "major advancement in programmatic AI" and granting access to "more than 13 million advertising impressions every second."

78.    Following the launch of the Kokai platform, the Company started transitioning its clients from the old platform, Solimar, to Kokai. Defendant Green highlighted the transition as the "largest platform overhaul in our company's history." Despite this, the Individual Defendants assured investors that the transition would be "without [] disruption" and Kokai would be fully rolled out throughout 2024.

**False and Misleading Statements**

*May 8, 2024 Press Release*

Verified Shareholder Derivative Complaint

79.    On May 8, 2024, Trade Desk issued the Q1 2024 Earnings Release. The Q1 2024 Earnings Release revealed that the Company posted a reported revenue of $491 million in the first quarter, accounting for a 28% increase year-over-year.

80.    The Q1 2024 Earnings Release also quoted Defendant Green, who highlighted the Company's strong results in the first quarter, stating:

> Q1 was a strong quarter for The Trade Desk as we delivered revenue of $491 million, accelerating growth to 28% year-over-year. Our outstanding performance to start the year underlines the value advertisers are placing on premium inventory on the open internet[.] With the continued strong growth of CTV, the growing ubiquity of UID2, new approaches to authentication, *greater deployment of first-party data and retail data, and with significant AI advances in our Kokai platform, we are better positioned than ever to deliver premium value to advertisers and continue to gain market share*.

(Emphasis added).

81.    The Q1 2024 Earnings Release also highlighted the Company's competitive advantages over other CTV advertising platforms, such as Amazon DSP, stating:

> The Trade Desk offers the largest CTV inventory marketplace in the industry, giving advertisers unmatched access to premium content across major networks and ad-supported streaming services around the world. *Because we do not compete in content or supply, we have built lasting relationships with premium publishers to help brands confidently engage their audiences and drive measurable results*.

(Emphasis added).

*May 8, 2024 Earnings Call*

82.    That same day, the Company hosted an earnings call with investors and analysts to discuss the first quarter's financial results (the "Q1 2024 Earnings Call").

83.    During his scripted remarks on the Q1 2024 Earnings Call, Defendant Green highlighted the Kokai's contribution to the strong results in the first quarter, stating that "*I believe our revenue growth acceleration in the first quarter speaks to the innovation and*

*value that we are delivering to our clients with Kokai*." (Emphasis added). Defendant Green continued with his remarks, highlighting Kokai's capabilities, stating:

> [A]nd the innovations in our Kokai platform will help our clients take advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the open Internet and *our ability to gain more than our fair share of the nearly $1 trillion advertising TAM [total addressable market]*.

(Emphasis added).

84.    During the Q1 2024 Earnings Call, Defendant Green also chose to highlight how Kokai's platform can drive demand-side revenue, and innovations made to get to that position, stating:

> One of the major innovations in Kokai is the Sellers and Publishers 500 Plus. *This is a curated marketplace that represents the best of the Open Internet, the premium Internet, where consumers spend the majority of their time online. It's live sports events such as March Madness, where we saw a 200% increase in spend compared to a year ago*. It's the latest movies and hot TV shows, it's music and podcasts on platforms like Spotify, it's trusted journalism.

(Emphasis added).

85.    Defendant Green's remarks also referred to the Kokai rollout plan, stating that updates would be rolled out to all of its customers over the coming quarters, stating:

> As a reminder, last year on 06/06, we started shipping Kokai. This platform launch is different for us because 06/06 last year marked just the beginning, and we've been shipping new features ever since. *We are quickly approaching some of the biggest UX and product rollouts of Kokai that nearly all of our customers will begin to use and see benefits from over the next few quarters, including a game-changing AI- fueled forecasting tool*.

(Emphasis added).

86.    During her own scripted remarks, Defendant Schenkein also touted Kokai's contribution to the Company's growth, stating that "All of our progress in areas such as

CTV, Retail Media, *Kokai* and UID2 helped deliver another quarter of *consistently strong growth and profitability to start 2024*." (Emphasis added).

87.    Defendant Schenkein continued, referring to Kokai as a long-term growth driver, stating:

> In closing, we are encouraged about the momentum of our business. *We're executing on large long-term growth drivers*, *including* CTV, international expansion, retail media, *our recent platform upgrade in Kokai*, UID2, as well as the upcoming US election cycle.

(Emphasis added).

88.    During the question-and-answer portion of the Q1 2024 Earnings Call, Defendant Green downplayed the competitive threat posed by Amazon DSP, Amazon's competing platform. For example, in response to one analyst's question regarding viewers who were watching increasingly walled-off advertisements on Amazon Prime, Defendant Green responded:

> So I'd love to see them evolve. Actually, not too dissimilarly from what we've seen from Roku. To see them evolve to a place where they embrace the Open Internet, embrace those common currency, so that advertisers can bring their own data to bear, and then they would get higher CPMs, they could have a lighter ad load, they could have a better ad experience, and all of that would be good for Prime Video customers, but there's a lot that has to happen.
>
> Until that happens, *I actually don't think they're that competitive. And I think all the other players have a much more competitive offering to the most premium advertisers, which is what television is really all about. And tell them, I think the premium supply doesn't have quite as much of a surplus as there could be if Amazon embrace that, and I think we're going to see it take a little while before we get there.*

(Emphasis added).

89.    Defendant Green also made sure to highlight the Company's competitive advantages, stating:

> *Advertisers want a competitive market with price discovery, because they*

*want to own their own future. It is easier than ever for advertisers to understand who is delivering value at all points of the digital advertising supply chain.* And they will increasingly gravitate to those who are helping them make the most of every advertising dollar with transparency and objectivity.

Of course, this is all made possible by our profitable business model, which generates significant cash flow, which in turn allows us to invest in the major platform upgrades that characterize Kokai.

So while I believe 2024 will be remembered as a year of great tech-driven disruption in our industry, I also believe it is a year that The Trade Desk will continue to differentiate itself from its competitors and continue to outpace the market. *As the industry races toward $1 trillion TAM, we are incredibly well-positioned to take more than our fair share.*

(Emphasis added).

### *May 10, 2024 Form 10-Q*

90.    On May 10, 2024, the Company filed its quarterly report on Form 10-Q for the first quarter of the 2024 Fiscal Year (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendant Schenkein and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Green and Schenkein attesting to the accuracy of the Q1 2024 10-Q and that the Q1 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

91.    In discussing updates made to the Kokai platform and the impact Kokai would have on the Company's competitive position, the Q1 2024 10-Q stated:

Our platform system applications are complex, multi-faceted and include applications that are highly customized in order to serve and support our clients, advertising inventory and data suppliers, as well as support our financial reporting obligations. *We regularly make improvements to our platform to maintain and enhance our competitive position.*

(Emphasis added).

92.    In discussing the risk factors that may impact the Company's performance, the Q1 2024 10-Q identified "superior competitive offerings," but downplayed the potential negative impact they may have on the Company, stating:

> If we fail to innovate or make the right investment decisions in our offerings and platform, we may fail to attract and retain advertisers and advertising agencies and our revenue and results of operations may decline.
>
> Our industry is subject to rapid and frequent changes in technology and laws governing our activities, evolving client needs and expectations and the frequent introduction by our competitors of new and enhanced offerings. ***If new or existing competitors have more attractive offerings, we may lose clients or clients may decrease their use of our platform***. New client demands, ***superior competitive offerings*** or new industry standards could require us to make unanticipated and costly changes to our platform or business model. We must constantly make investment decisions regarding offerings and technology to meet client demand and evolving industry and legal standards. We may make bad decisions regarding these investments. ***Furthermore, even if we believe that our investments improve upon our platform and offerings, such as updates to our various platform features and user interface, they may nevertheless fail to meet new or existing client expectations or preferences, which could result in decreased client adoption or use of our platform***.

(Emphasis added).

### May 17, 2024 LUMA Partners' Digital Media Summit

93.    On May 17, 2024, Defendant Jacobson represented the Company during the LUMA Partners' Digital Media Summit. During the presentation, Defendant Jacobson stated the following in providing an update on Kokai:

> I mean even just in the past few weeks we've had announced expansions in our partnership with Disney with Roku with LG. There's so many of them that continue to lean in and embrace programmatic and it's because of the results that advertisers get.

Of course we're working to continue to innovate that, so we talked about ***Kokai, which is the upgrade of our platform and one of the components there is something we call the sellers and Publishers 500 plus. That's pulling together the best access of inventory across the open internet to make it easy for advertisers to buy and in a brand-suitable way that still transparently delivers performance***.

(Emphasis added).

94.     Defendant Jacobson continued with her presentation, stating the following regarding Kokai's impact on the Company's competitiveness:

We believe in transparency. We believe in giving our advertisers choice, but we also recognize the value of machine learning or AI which is why we've pulled in the opportunity for advertisers to bring incredible first-party data assets to bear. ***We of course want to complement that with the amazing retail assets that we have available on the platform as well as other third-party offerings and then we want to make sure that we're enriching that with AI, so we do that through what we call Kokai*** because we recognize that we don't want to have the legacy approach of saying I'm going to select an audience provider based on whomever had the most interesting PowerPoint that came to my office last week or I'm going to scroll and click through and I'm going to hit anything that has the word fast food in it.

You want machine learning to be put to work on your behalf to help select the right data assets based on what your campaign is trying to do to make sure you're advertising at the optimal price point for those impressions, to make sure you understand who you're advertising to but there also needs to be transparency and accountability it can't just be don't worry I have this black box and out the other side I'll let you know how well I did which is why we provide event level data which is why we work with so many amazing third-party providers, which is why we give advertisers data themselves so they can do their own analysis or marry it with other assets they have. So to me I think that ***yes machine learning or AI has a place but it can't replace transparency and trust I think that's at the epicenter of everything we do***.

(Emphasis added).

***June 28, 2024 Press Release***

95.     On June 28, 2024, the Company issued a press release titled "Traders tout how

Kokai is driving campaign success." The press release advertised Kokai's popularity among users as well as the success of its rollout.

96.     The press release stated, in relevant part:

> ***Exactly one year since The Trade Desk announced its vision for Kokai***, the demand-side platform welcomed clients and partners to its New York City office to share more about its latest — and ***most transformative*** — ***platform update***, made available to clients in early June.
>
> While over the last year the ad world voiced shared concerns around made-for-advertising websites, the value of user-generated content, and how to save journalism on the open internet (among other important topics), The Trade Desk was building and shipping new innovations aimed at making the industry stronger and the internet a better, easier place to buy media. ***Already, Kokai — The Trade Desk's new UI — has yielded notable campaign results, as told by the traders who have been using our new tools***.
>
> Overall, campaigns in Kokai Beta saw improved KPI performance, with notable optimizations across the board. This includes a 24% drop in cost per unique reach, 36% lower cost per click (CPC), and a 34% reduction in cost per action (CPA), on average. While it's clear our platform is driving results against a set of full-funnel KPIs, there are several key differentiators driving trader adoption, confidence, and success on the platform.

(Emphasis added).

### *August 8, 2024 Press Release*

97.     On August 8, 2024, the Company issued a press release revealing the financial results for the second quarter of the 2024 Fiscal Year (the "Q2 2024 Earnings Release"). The Q2 2024 Earnings Release announced the Company had a reported revenue of $585 million, which was a 26% increase year over year.

98.     The Q2 2024 Earnings Release also quoted Defendant Green in highlighting the results, again awarding Kokai recognition for its contribution, stating:

> We've made significant strides in CTV, retail media and identity, empowering the world's largest brands to buy premium media on the open internet with unprecedented agility and precision. As Kokai ramps, we're ***intuitively***

***surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data***. With ongoing innovations in Kokai, the widespread adoption of UID2, and the expanding use of retail data, we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV.

(Emphasis added).

99.    The Q2 2024 Earnings Release continued quoting Defendant Green's statements, highlighting the following regarding the ramp-up of Kokai:

Q2 was another strong quarter for The Trade Desk, with revenue of $585 million, representing 26% year-over-year growth. We've made significant strides in CTV, retail media and identity, empowering the world's largest brands to buy premium media on the open internet with unprecedented agility and precision. ***As Kokai ramps, we're intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data. With ongoing innovations in Kokai***, *the wide- spread adoption of UID2, and the expanding use of retail data, we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV*.

(Emphasis added).

100.    The Q2 2024 Earnings Release also highlighted the Company's competitive advantages that it had against competing platforms, stating:

The Trade Desk offers the largest CTV inventory marketplace in the industry, giving advertisers unmatched access to premium content across major networks and ad-supported streaming services around the world. ***Because we do not compete in content or supply, we have built lasting relationships with premium publishers to help brands confidently engage their audiences and drive measurable results***.

(Emphasis added).

***August 8, 2024 Earnings Call***

101.    That same day, the Company hosted a call with investors and analysts to

discuss the second quarter results (the "Q2 2024 Earnings Call"). During his scripted remarks on the Q2 2024 Earnings Call, Defendant Green highlighted Kokai's performance thus far, stating:

> In order to help advertisers think about efficacy in new ways and to help them take advantage of the premium open Internet where consumers are most leaned in, ***after years of development, we launched our most ambitious platform to date, Kokai***. Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers. Kokai helps them target those new audiences across the many thousands of destinations that comprise the best of the open Internet.
>
> And it leverages AI to help them make sense of the roughly 15 million ad opportunities we see every second and the hundreds of variables associated with each one of them. And all of this happens in the context of what any given client's unique business growth goals are. ***I've been incredibly encouraged by the early results from Kokai***. For those campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%.
>
> Cost per acquisition has improved by about 27% as data elements per impression have gone up by about 30%. In addition, performance metrics have improved by about 25%, helping to unlock performance budgets on our platform for years to come. So, our clients are getting more precise, more cost-efficient, and then they're able to reinvest for even more reach and drive a much better return on ad spend. Given everything I said about what CMOs [chief marketing officers] today are trying to accomplish and the pressures that they are under, ***I firmly believe that we have met the moment with Kokai***.

(Emphasis added).

102.    Defendant Green also made the following statements highlighting Kokai on the Q2 2024 Earnings Call, stating:

> Our relationships with the world's leading brands and their agencies are only getting stronger. It's one of the key reasons we continue to ***significantly outperform the market*** and why I believe we'll continue to gain share in the years ahead.

And we are thrilled and thankful to be partnering with the world's most forward-thinking marketers as we bring that value to life. We believe we've aligned our interest with theirs, creating a very bright future for both of us. Let me bring my remarks to a close by summarizing what all of this means for us and why I believe ***The Trade Desk is positioned so well to capture more than our fair share of that $1 trillion TAM. We're in the midst of a period of tremendous change in our industry, change that's the result of macro market pressures as well as rapid innovation, such as Kokai***.

During the second quarter, we continued to invest in our team, our platform and our infrastructure to support sustained growth. Thanks to our careful management of operating expenses in recent years, ***we are well positioned to innovate our platform, invest in cutting edge technologies like AI, expand our teams and further distance ourselves from competitors***.

(Emphasis added).

103. In discussing the Kokai rollout on the Q2 2024 Earnings Call, Defendant Green stated that "***I've been incredibly encouraged by the early results from Kokai***[,]" while also touting how the "campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%[,]" and "[c]ost per acquisition has improved by about 27% as data elements per impression have gone up by about 30%." (Emphasis added). Defendant Green also made a point to highlight how "***performance metrics have improved by about 25 percent, helping to unlock performance budgets on our platform for years to come***." (Emphasis added).

104. In discussing what Chief Marketing Officers ("CMOs") have stated about "putting a premium on the efficacy of marketing," Defendant Green stated, "***Given everything I said about what CMOs today are trying to accomplish and the pressures that they are under, I firmly believe that we have met the moment with Kokai***." (Emphasis added).

105. During the question-and-answer portion of the Q2 2024 Earnings Call, Defendant Green responded to a question about the Company outperforming competitors, stating:

*Question*: Congrats on another great quarter. Jeff, could you maybe provide your high-level thoughts on the current digital ad environment right now. And kind of going back to what you mentioned kind of at the start of the call, what's allowing Trade Desk to continue to so meaningfully outperform everyone else in gains here? Thank you.

*Defendant Green*: Thanks, Shyam. Really appreciate the question. So, first, let me just talk about our company before I talk about the macro environment. ***I don't know that I have ever been more proud of our team across the board, not just in our go-to- market teams, but of course, our engineering team, and throughout the entire company. I don't know that we've ever been firing on all cylinders in the way that we are right now***.

And that has absolutely been essential in this environment, because we've never had more change, especially in CTV, in a three- to four-month period that we've had. All good things coming at us, just lots of opportunity, but responding to it all and adjusting to it all is something that I think our team has done really, really well. One thing that I do want to highlight at a macro level that I think makes us different than other players in the space is that we are not a destination, and we are not sell-side.

So, often we get compared to other companies that are dependent on ads, but they are destinations, whether they are an app, or whether they're a mobile company, or whether they're a website. People are trying to go to those to those destinations, and then they have added inventory that they have sell in moments. We are not a destination, or a B2B company that represents buyers.

So, there is a big difference right now between the sell-side and the buy-side. And we're seeing some changes on the sell- side in almost every category, but we're not on the sell-side, we're on the buy-side. And ***as a result of that, I believe that The Trade Desk is in a stronger position than we have ever been before***.

(Emphasis added).

106.   In discussing how Kokai is a key growth driver for the Company on the Q2 2024 Earnings Call, Defendant Schenkein stated:

In closing, we are extremely pleased with our strong performance in the second quarter and throughout the first half of the year. The opportunity ahead

of us has never been more promising. We are positioned within a large and expanding market, supported by a business model that consistently delivers robust top line growth, significant profitability and strong cash flow.

With *key growth drivers* such as CTV, retail media, international expansion, a strong identity strategy, and *a major product upgrade with Kokai, we remain confident and optimistic about our future as we navigate the second half of this year, and look forward to 2025 and beyond*.

(Emphasis added).

### *August 8, 2024 Form 10-Q*

107.    On August 8, 2024, the Company filed its quarterly report on Form 10-Q for the second quarter of the 2024 Fiscal Year (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendant Schenkein and attached SOX certifications signed by Defendants Green and Schenkein attesting to the accuracy of the Q2 2024 10-Q and that the Q2 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

108.    The Q2 2024 10-Q gave the following updates on Kokai and its impact on the Company's competitiveness:

Our platform system applications are complex, multi-faceted and include applications that are highly customized in order to serve and support our clients, advertising inventory and data suppliers, as well as support our financial reporting obligations. *We regularly make improvements to our platform to maintain and enhance our competitive position*.

(Emphasis added).

109.    The Q2 2024 10-Q also made the same misrepresentations regarding the Company's risk factors as was made in the Q1 2024 10-Q. *Supra* ¶ 92.

### *October 3, 2024 Proxy Statement*

110.    On October 3, 2024, the Company filed a proxy statement on Schedule 14A with the SEC (the "October 2024 Proxy Statement"). Defendants Green, Buyer,

Cunningham, Falberg, Jacobson, Rajaram, and Wells solicited the October 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

111. The October 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*, reincorporate the Company from the State of Delaware to the State of Nevada.

112. The October 2024 Proxy Statement highlighted Kokai's impact on the Company's recent success, stating, in relevant part:

> Our success as a company would not have been possible without the foresight and strategic decisions of our visionary founder, Chief Executive Officer and controlling stockholder, Jeff Green. Mr. Green has become a thought leader for our industry, and has consistently guided the Company by successfully anticipating industry trends and changes and developing our strategy and products to take advantage of those opportunities. . . .Some of our strategic decisions in recent years have included, among others. . . .

> In 2023, we announced the launch of Kokai, our largest core platform overhaul to date that took over a year to develop. With advances in AI infused across the platform, Kokai helps marketers optimize ad campaigns across all channels by focusing on audiences first – using data about their most loyal customers to find and build new customer relationships. With Mr. Green's vision for Kokai, we are helping programmatic traders rethink how they approach digital ad campaigns, optimizing the value of their campaign dollars.

113. Defendants Green, Buyer, Cunningham, Falberg, Jacobson, Rajaram, and Wells caused the October 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was experiencing unanticipated challenges in rolling out Kokai, specifically in transitioning clients from Solimar to Kokai; (2) as a result of these challenges, there was a delay in Kokai's full rollout; and (3) the Company's failure to fully rollout Kokai according to the expected timeframe would have a negative impact on the Company's business, operations, and financial prospects.

114. As a result of Defendants Green, Buyer, Cunningham, Falberg, Jacobson, Rajaram, and Wells causing the 2024 Proxy Statement to be false and misleading,

Company shareholders voted, *inter alia*, to reincorporate the Company from the State of Delaware to the State of Nevada.

### November 7, 2024 Press Release

115.   On November 7, 2024, the Company issued a press release announcing the financial and operational results of the third quarter of the 2024 Fiscal Year (the "Q3 2024 Earnings Release"). The Q3 2024 Earnings Release revealed that the Company's reported revenue for the third quarter was $628 million, which reflected an accelerated growth of 27%. In addition, the Q3 2024 Earnings Release announced a projected fourth quarter revenue guidance of $756 million.

116.   The Q3 2024 Earnings Release also quoted Defendant Green, who highlighted the Company's performance and Kokai's contribution to that success, stating:

> The Trade Desk delivered strong performance in the third quarter, with revenue of $628 million, accelerating growth to 27%. This performance underlines the value that advertisers are placing on precision and transparency as they work with us to maximize the impact of their campaigns[.] ***As we enter our busiest time of year and look ahead to 2025, we have never been in a better position to capture greater share of the $1 trillion advertising TAM***. 2024 has been a banner year for CTV. Many of the largest media companies are now working with us to help clients capture the full value of CTV advertising via programmatic. We are similarly excited about the momentum in retail media and the pace of adoption by advertisers who are taking advantage of our retail data marketplace. ***And the performance improvements that our clients are seeing with Kokai - our largest platform upgrade to date - showcase the value of audience-driven, AI-enabled innovation***.

(Emphasis added).

### November 7, 2024 Earnings Call

117.   That same day, the Company hosted an earnings call with investors and analysts to discuss the third quarter results (the "Q3 2024 Earnings Call").

118.   During his scripted remarks on the Q3 2024 Earnings Call, Defendant Green informed investors that Kokai's performance was positive, stating that ***"[w]e are already***

*seeing the results of Kokai performance today*, but we're just getting started." (Emphasis added).

119. During her own scripted remarks on the Q3 2024 Earnings Call, Defendant Schenkein highlighted Kokai's contribution to the Company's growth, stating that "*[k]ey investment initiatives, including performance advancements in our Kokai platform . . . are not only strengthening our foundation, but position us for durable growth in 2025 and beyond.*" (Emphasis added).

120. During the question-and-answer portion of the Q3 2024 Earnings Call, Defendant Green responded to one analyst's question pertaining to how users can also trust the data surrounding Kokai, stating:

> *Question*: I guess what type of work does it take to help CMOs and the users understand the metrics coming out of Kokai but also to kind of gain trust around them? I know that's been a challenge in some other walled garden platforms, so people trusting the attribution data.

> *Defendant Green*: I really appreciate the question because *I think this is one of the more nuanced ways that we have just so much opportunity in front of us*. . . .

> *But the state of measurement is that walled gardens have essentially been grading their own homework for many, many years. And one of the things that they've done really well is convinced people to use their own metrics and kept things quite simple. But at times, that's been really difficult for some of the biggest brands in the world because they'll be told by a walled garden, we help you sell 101 toothbrushes, when the company actually only sold 100 toothbrushes total*. So, when you have that phenomenon, you start to doubt the credibility of those metrics.

> We have a very different dilemma or challenge, which is that we've been sharing so much data with them and given them so many options about the way to attribute success and attribute sales we've overwhelmed them with complexity and with numbers and there are so many different ways for us to answer those questions. . . .

> So, *I'm very optimistic about what that means for the future* because I do

think there is a very important principle that we have been saying since the day we went public, which is objectivity matters a lot today, but it will matter more tomorrow, and it will matter more the day after that. ***And as time marches on, we think that that continues to be one of our greatest strategic advantages over the biggest names in tech***.

(Emphasis added).

121.    In highlighting the adoption of Kokai, Defendant Green stated:

I'm incredibly proud of our performance in the third quarter, and we are currently firing on all cylinders, whether that's what's happening in CTV, it being both our largest channel and our fastest growing which those two themes don't usually go hand in hand, or the amazing efforts in Kokai.

***It started the year as an engineering effort, and it since turned into both an engineering effort as well as our sales and client services teams getting that adopted. The adoption has been phenomenal***. The product is the best that we've ever shipped. So, a lot going for us in that. UID2 has become the primary currency of identity in the open Internet.

(Emphasis added).

***November 7, 2024 Form 10-Q***

122.    On November 7, 2024, the Company filed its quarterly report on Form 10-Q for the third quarter of the 2024 Fiscal Year (the "Q3 2024 10-Q"). The Q3 2024 10-Q was signed by Defendant Schenkein and attached SOX certifications signed by Defendants Green and Schenkein attesting to the accuracy of the Q3 2024 10-Q and that the Q3 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

123.    In providing updates on Kokai and its impact on the Company's competitive position, the Q3 2024 10-Q stated:

Our platform system applications are complex, multi-faceted and include applications that are highly customized in order to serve and support our clients, advertising inventory and data suppliers, as well as support our

financial reporting obligations. ***We regularly make improvements to our platform to maintain and enhance our competitive position***.

(Emphasis added).

124.  The Q3 2024 10-Q also made the same misrepresentations regarding the Company's risk factors as was made in the Q1 2024 10-Q. *Supra* ¶ 92.

125.  The statements referenced in ¶¶ 79-109, 115-24 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company was experiencing unanticipated challenges in rolling out Kokai, specifically in transitioning clients from Solimar to Kokai and performance issues that impacted customer adoption; (2) as a result of these challenges, there was a delay in Kokai's full rollout; (3) in certain instances, this delay was deliberate to maximize the Company's short-term profits; (4) the Company was also experiencing competition from Amazon and other platforms that detracted from the Company's market share; (5) the Company's engineering and sales teams were not structured appropriately to support the Kokai rollout while fending off competition; and (6) the Company's failure to fully rollout Kokai according to the expected timeframe would have a negative impact on the Company's business, operations, and financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

### *February 12, 2025 Press Release*

126.  The truth emerged on February 12, 2025 when the Company issued the FY 2024 Earnings Release. The FY 2024 Earnings Release revealed that the Company's fourth quarter revenue was only $741 million, $15 million less than the previously provided guidance of $756 million, and $18.8 million less than analysts' predicted revenue of $759.8 million.

127.    The FY 2024 Earnings Release also revealed disappointing revenue guidance for the ongoing first quarter of the fiscal year ended December 31, 2025 (the "2025 Fiscal Year"). The revenue guidance for the first quarter of the 2025 Fiscal Year, as reported by the FY 2024 Earnings Release, was at least $575 million, over $6 million less than analysts' expected guidance of at least $581.5 million.

128.    The FY 2024 Earnings Release also quoted Defendant Green, who stated that "[W]e are disappointed that we fell short of our own expectation in the fourth quarter." Defendant Green's comments also revealed that the Company "undertook a reorganization to accelerate opportunities across CTV, retail media, identity, supply chain optimization, and audio[,] while forging ahead with innovations like Kokai."

### *February 12, 2025 Earnings Call*

129.    That same day, the Company hosted the FY 2024 Earnings Call to discuss the fourth quarter and year-end results. During the FY 2024 Earnings Call, Defendant Green revealed that the Company had still not yet fully adopted Kokai, revealing that while the Company would be moving all of its clients to Kokai that same day, it still would be "maintaining 2 systems, Solimar and Kokai." Defendant Green also noted how maintaining two systems still "slows us down," before noting that "Kokai is more effective in almost every way."

130.    Defendant Green also offered the following during his prepared remarks on the FY 2024 Earnings Call, stating:

> Our brightest days are still ahead of us, but before I talk about that, I want to spend a few minutes sharing what we got wrong and the changes we are making to meet this moment and maximize our unique and growing opportunity. Starting off, let me explain it as I see it, what falling short of our own expectations does NOT represent. This didn't happen because the opportunity isn't as big as we thought. In this case, it isn't because of competition either. ***For Q4, the reality is that we stumbled due to a series of small execution missteps while simultaneously preparing for the future***.

* * *

In that effort, I want to highlight four major changes we've made at The Trade Desk in the last few months, and some related initiatives that accompany them. First, we did the largest reorganization in company history in December. While we often make structural changes at the end of the year to improve our business, this was bigger than usual.

(Emphasis added).

131.    In discussing the recent reorganization of the Company, Defendant Green revealed:

If this were a sporting event, we'd still have a championship caliber team. But in this particular game, we turned over the ball too many times. That said, we see a larger and faster growing market than we originally expected, which is why we have been making changes and will continue to do so. Simply put, as you've seen before, as companies grow and become increasingly complex, they need recalibration to unlock new opportunities. We are recalibrating our larger company for an even stronger future.

In that effort, I want to highlight four major changes we've made at The Trade Desk in the last few months and some related initiatives that accompany them. First, we did the largest reorganization in company history in December. While we often make structural changes at the end of the year to improve our business, this was bigger than usual. For most people in the company, we provided a much clearer view of their roles and responsibilities, and for most, that also meant a change in reporting structure. Additionally, we streamlined client facing teams, reducing complexity, and clarifying responsibilities. Some team focus on brands, while others focus on agencies. Our commitment to agencies remains strong, but we are also expanding brand direct relationships, particularly through joint business plans, which grow 50% faster than the rest of our business.

Second, beyond structural improvements, we placed a stronger emphasis on internal effectiveness and scalability. Over the past two months, leadership has spent more time discussing operational improvements than at any other point in our history. While we've historically been focused on external opportunities, we understand that this moment requires us to scale our internal operations and continue hiring senior talent to support long-term growth. These changes position us to execute at a higher level and capitalize on the

Verified Shareholder Derivative Complaint

expanding market opportunities ahead.

Third, we have increased our resource allocation on brands. A broader shift is occurring in the industry. Advertisers are becoming more strategic and data driven in their media buying decisions, and that's great for us. While this shift has caused short-term fluctuations, it's ultimately aligned with our long-term strengths. We recognize that advertising will ebb and flow. At the same time, as advertisers prioritize precision and efficacy, our programmatic data-driven platform is becoming more essential than ever to brands and agencies.

This is evident in the growing number of joint business plans or JBPs that we've secured with over 100 of the world's leading brands, many of them in the second half of last year. JBPs provide a structured, mutually beneficial framework for brands, their agencies and The Trade Desk, and they reinforce the long-term value we bring to the industry. They also historically grow faster than the rest of our business.

Fourth, we revamped our product development process, shifting back to smaller agile teams that release updates weekly instead of drifting towards waterfall methods, which are less conducive to our fast-paced and changing industry. Our engineering team is now divided into nearly 100 scrum teams with a system to more easily ship and collaborate with the business team on what has shipped and what will ship and when. I expect this to continue to accelerate Kokai enhancements and complete the transition of 100% of our clients from Solimar to Kokai during this calendar year.

132.   Later in the FY 2024 Earnings Call, during the question-and-answer portion, in response to a question regarding "issues with Kokai rollout Pace," Defendant Green explained the pace of Kokai's rollout, revealing:

The environment wasn't perfect, but we knew that when we guided even if it was slightly harder than we thought, we've navigated that before. So you are right. And I know there is going to be 1,000 questions, a bunch of you -- well, we actually started a couple of them, and I know there will be more because we've done so well for so long at setting expectations. And when we talk about the missteps specifically, many of them involve people, mistakes that aren't appropriate to discuss publicly, especially when people are already learning from these mistakes.

*One of those -- you're right, that Kokai rolled out slower than we anticipated. But much of that was for good reason. We've seen moments and places to inject AI like improving the foundation of our forecasting and performance models. That is a short-term negative for sure, but it is a long-term negative. We are working -- I'm sorry, it's a long-term positive, sorry. We are working really hard to get the deals right and lay groundwork to move the upfront to digital.*

Again, long term, I think this is amazingly good for us. And I'm confident we are building the right things. ***In other words, in some cases, the slower Kokai rollout was deliberate, a quicker rollout would result in more short-term spend, and we don't always build what the customers want. Instead, we are trying to understand what the customer needs***. Elevating us and them together is a much harder task than simply taking orders. So as it relates to the internal changes, I think it is best to operate a company with our talent and the opportunity that we're facing to build the org and the team of the future, as fast as possible so that we capture the most market share possible at end state.

(Emphasis added).

133.    On this news, the Company's stock price fell $40.31 per share, or approximately 33%, from a closing price of $122.23 per share on February 12, 2025 to close at $81.92 per share on February 13, 2025.

## REPURCHASES DURING THE RELEVANT PERIOD

134.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $110.5 million to repurchase approximately 978,000 shares of its own common stock at artificially inflated prices from August 2024 through December 2024.

135.    According to the Q3 2024 10-Q, between August 1, 2024 and August 31, 2024, the Company repurchased 117,000 shares of its own common stock at an average price per share of approximately $103.74, for a total cost to the Company of approximately $12,137,580.

136.    As the Company's stock was actually worth only $81.92 per share, the price

at closing on February 13, 2025, the Company overpaid by approximately $2,552,940 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

137.   According to the Q3 2024 10-Q, between September 1, 2024 and September 30, 2024, the Company repurchased 400,000 shares of its own common stock at an average price per share of approximately $104.39 per share, for a total cost to the Company of approximately $41,756,000.

138.   As the Company's stock was actually worth only $81.92 per share, the price at closing on February 13, 2025, the Company overpaid by approximately $8,988,000 for repurchases of its own stock between September 1, 2024 and September 30, 2024.

139.   According to the Form 10-K the Company filed with the SEC on February 21, 2025 for the annual period ended December 31, 2024 (the "2024 10-K"), between October 1, 2024 and October 31, 2024, the Company repurchased 214,000 shares of its own common stock at an average price per share of approximately $115.26, for a total cost to the Company of approximately $24,665,640.

140.   As the Company's stock was actually worth only $81.92 per share, the price at closing on February 13, 2025, the Company overpaid by approximately $7,134,760 for repurchases of its own stock between October 1, 2024 and October 31, 2024.

141.   According to the 2024 10-K, between November 1, 2024 and November 30, 2024, the Company repurchased 38,000 shares of its own common stock at an average price per share of approximately $128.91 per share, for a total cost to the Company of approximately $4,898,580.

142.   As the Company's stock was actually worth only $81.92 per share, the price at closing on February 13, 2025, the Company overpaid by approximately $1,785,620 for repurchases of its own stock between November 1, 2024 and November 30, 2024.

143.   According to the 2024 10-K, between December 1, 2024 and December 31, 2024, the Company repurchased 209,000 shares of its own common stock at an average price per share of approximately $129.35 per share, for a total cost to the Company of

approximately $27,034,150.

144.    As the Company's stock was actually worth only $81.92 per share, the price at closing on February 13, 2025, the Company overpaid by approximately $9,912,870 for repurchases of its own stock between December 1, 2024 and December 31, 2024.

145.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $30.4 million.

## DAMAGES TO TRADE DESK

146.    As a direct and proximate result of the Individual Defendants' conduct, Trade Desk has lost and will continue to lose and expend many millions of dollars.

147.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

148.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

149.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

150.    Such losses include the Company's overpayment of approximately $30.4 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

151.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

152.   As a direct and proximate result of the Individual Defendants' conduct, Trade Desk has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

153.   Plaintiff brings this action derivatively and for the benefit of Trade Desk to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Trade Desk, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b), 20(a), and 14(a) of the Exchange Act.

154.   Trade Desk is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

155.   Plaintiff is, and has been at all relevant times, a shareholder of Trade Desk. Plaintiff will adequately and fairly represent the interests of Trade Desk in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

156.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

157.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Trade Desk's Board consisted of the following eight individuals: Defendants Green, Buyer, Cunningham, Falberg, Jacobson, Rajaram, and Wells (the "Director-Defendants") and non-party Alex Kayyal (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was filed.

158.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of

the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

159.  In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Trade Desk to issue materially false and misleading statements. Specifically, the Director-Defendants caused Trade Desk to issue false and misleading statements which were intended to make Trade Desk appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

160.  Moreover, Defendants Green, Buyer, Cunningham, Falberg, Jacobson, Rajaram, and Wells solicited the October 2024 Proxy Statement, which called for a shareholder vote to, *inter alia*, reincorporate the Company from the State of Delaware to the State of Nevada.

161.  Additional reasons that demand on Defendant Green is futile follow. Defendant Green co-founded the Company and has served as the Company's President, CEO, and the Chairman of the Board since November 2009. The Company provides Defendant Green with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged

herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Green is a defendant in the Securities Class Actions. Moreover, Defendant Green has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $166 million. For these reasons, too, Defendant Green breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Buyer is futile follow. Defendant Buyer has served as a Company director since March 2019 and as Lead Independent Director of the Company since February 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Buyer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Cunningham is futile follow. Defendant Cunningham has served as a Company director since January 2022. She is also a member of the Nominating and Corporate Governance Committee. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Cunningham has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein,

having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $160,712. For these reasons, too, Defendant Cunningham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

164. Additional reasons that demand on Defendant Falberg is futile follow. Defendant Falberg has served as a Company director since August 2016. She also serves as the Chair of the Compensation Committee. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Falberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

165. Additional reasons that demand on Defendant Jacobson is futile follow. Defendant Jacobson has served as the Company's Chief Strategy Officer since February 2022 and has served as a Company director since January 2024. The Company provides Defendant Jacobson with her principal occupation for which she receives handsome compensation. Thus, as the Company admits, she is a non-independent director. As a trusted, long-time director and the Company's Chief Strategy Officer, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, Defendant Jacobson personally made some of the false and misleading statements alleged herein. Further, Defendant Jacobson is a defendant in one of the Securities Class Actions. Moreover, Defendant Jacobson has materially benefitted from the Individual Defendants' breaches of fiduciary

1
2
3
4
5

duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $994,335. For these reasons, too, Defendant Jacobson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

6
7
8
9
10
11
12
13
14
15
16
17
18

166.    Additional reasons that demand on Defendant Rajaram is futile follow. Defendant Rajaram has served as a Company director since May 2018. He also serves as a member of the Audit Committee and the Compensation Committee. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Rajaram has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $677,204. For these reasons, too, Defendant Rajaram breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

19
20
21
22
23
24
25
26
27
28

167.    Additional reasons that demand on Defendant Wells is futile follow. Defendant Wells has served as a Company director since December 2015. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Wells breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and,

therefore, excused.

168.    Additional reasons that demand on the Board is futile follow.

169.    Demand in this case is further excused because Defendant Jacobson is beholden to and controlled by Defendant Green, a primary interested wrongdoer who is the Company's controlling shareholder. As an employee of the Company, Defendant Jacobson's continued employment is controlled by Defendant Green. In light of this control, Defendant Jacobson cannot consider a demand against Defendant Green, an interested, primary wrongdoer, as she is dependent on him for her continued employment with the Company and the lucrative compensation that goes with that. Thus, Defendant Jacobson is unable to evaluate demand with disinterest or independence given Defendant Green's control over her.

170.    Defendants Wells (as Chair), Buyer, and Rajaram served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

171.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise

the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

172.   Trade Desk has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Trade Desk any part of the damages Trade Desk suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

173.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

174.   The acts complained of herein constitute violations of fiduciary duties owed by Trade Desk's officers and directors, and these acts are incapable of ratification.

175.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Trade Desk.

If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Trade Desk, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

176.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Trade Desk to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

177.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

178.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit

the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

181.    Under the direction and watch of Defendants Green, Buyer, Cunningham, Falberg, Jacobson, Rajaram, and Wells, the October 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was experiencing unanticipated challenges in rolling out Kokai, specifically in transitioning clients from Solimar to Kokai and performance issues that impacted customer adoption; (2) as a result of these challenges, there was a delay in Kokai's full rollout; (3) in certain instances, this delay was deliberate to maximize the Company's short-term profits; (4) the Company was also experiencing competition from Amazon and other platforms that detracted from the Company's market share; (5) the Company's engineering and sales teams were not structured appropriately to support the Kokai rollout while fending off competition; and (6) the Company's failure to fully rollout Kokai according to the expected timeframe would have a negative impact on the Company's business, operations, and financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

182.    In the exercise of reasonable care, Defendants Green, Buyer, Cunningham, Falberg, Jacobson, Rajaram, and Wells should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the October 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder

determination in the October 2024 Proxy Statement, including but not limited to, the reincorporation of the Company from the State of Delaware to the State of Nevada.

183.   As a result of the material misstatements and omissions contained in the October 2024 Proxy Statement, Company shareholders voted, *inter alia*, to reincorporate from the State of Delaware to the State of Nevada.

184.   The Company was damaged as a result of the Defendants Green, Buyer, Cunningham, Falberg, Jacobson, Rajaram, and Wells's material misrepresentations and omissions in the October 2024 Proxy Statement.

185.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

186.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Trade Desk. Not only is Trade Desk now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Trade Desk by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase ***978,000*** of its own shares at artificially inflated prices, damaging Trade Desk.

188.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

189.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Trade Desk not misleading.

190.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

191.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    The Individual Defendants, by virtue of their positions with Trade Desk and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Trade Desk and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Trade Desk to engage in the illegal conduct and practices complained of herein.

194.    Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

**FOURTH CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

195.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Trade Desk's business and affairs.

197.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

198.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Trade Desk.

199.   In breach of their fiduciary duties owed to Trade Desk, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was experiencing unanticipated challenges in rolling out Kokai, specifically in transitioning clients from Solimar to Kokai and performance issues that impacted customer adoption; (2) as a result of these challenges, there was a delay in Kokai's full rollout; (3) in certain instances, this delay was deliberate to maximize the Company's short-term profits; (4) the Company was also experiencing competition from Amazon and other platforms that detracted from the Company's market share; (5) the Company's engineering and sales teams were not structured appropriately to support the Kokai rollout while fending off competition; and (6) the Company's failure to fully rollout Kokai according to the expected timeframe would have a negative impact on the Company's business, operations, and financial prospects. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

200.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

201.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

202.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while five of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $117.7 million.

203.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Trade Desk's securities.

204.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of

artificially inflating the price of Trade Desk's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

205.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

206.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Trade Desk has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

207.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

<u>FIFTH CLAIM</u>
**Against the Individual Defendants for Unjust Enrichment**

208.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Trade Desk.

210.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Trade Desk that was tied to the performance or artificially inflated valuation of Trade Desk, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

211.   Plaintiff, as a shareholder and a representative of Trade Desk, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation,

obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

212.  Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

213.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Trade Desk, for which they are legally responsible.

215.  As a direct and proximate result of the Individual Defendants' abuse of control, Trade Desk has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

216.  Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

217.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Trade Desk in a manner consistent with the operations of a publicly held corporation.

219.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Trade Desk has sustained and will continue to sustain significant damages.

220.  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

221.  Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## EIGHTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

222.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

224.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Trade Desk to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

225.   In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

226.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

227.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Trade Desk, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Trade Desk;

(c)   Determining and awarding to Trade Desk the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly

and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Trade Desk and the Individual Defendants to take all necessary actions to reform and improve Trade Desk's corporate governance and internal procedures to comply with applicable laws and to protect Trade Desk and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Trade Desk to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Trade Desk restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

//

//

//

//

//

//

66

Verified Shareholder Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: March 13, 2025                    Respectfully submitted,

                                         **THE BROWN LAW FIRM, P.C.**

                                         */s/*Robert C. Moest_____
                                         Robert C. Moest, Of Counsel, SBN 62166
                                         2530 Wilshire Boulevard, Second Floor
                                         Santa Monica, CA 90403
                                         Telephone: (310) 915-6628
                                         Facsimile: (310) 915-9897
                                         Email: RMoest@aol.com

                                         *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

      I, Daniel Jong, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 13__ day of March, 2025.

Signed by:

*Daniel Jong*

56834A72C7D64E4...

Daniel Jong